## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEIF HAUGEN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:17-cv-11480 ) |
| STAPLES, INC., ROBERT SULENTIC, SHIRA GOODMAN, DREW G. FAUST, CURTIS FEENY, PAUL-HENRI FERRAND, DEBORAH A. HENRETTA, KUNAL S. KAMLANI, JOHN F. LUNDGREN, VIJAY VISHWANATH, and PAUL F. WALSH, | ) **CLASS ACTION COMPLAINT FOR** ) **VIOLATIONS OF SECTIONS 14(a) AND** ) **20(a) OF THE SECURITIES** ) **EXCHANGE ACT OF 1934** ) ) **JURY TRIAL DEMANDED** ) ) ) |
| Defendants. | ) ) |

Plaintiff Leif Haugen ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Staples, Inc. ("Staples" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and together with Staples, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between Staples and Sycamore Partners Management, L.P., through its subsidiaries ("Sycamore").

2.      On June 28, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's stockholders stand to

receive $10.25 in cash for each share of Staples common stock they own (the "Merger Consideration").

3.      On August 3, 2017, the Board authorized the filing of a materially incomplete and misleading definitive proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's stockholders in the Proxy, they have failed to disclose material information that is necessary for stockholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; and (ii) the valuation analyses performed by the Company's financial advisors, Barclays Capital Inc. ("Barclays") and Morgan Stanley & Co. LLC ("Morgan Stanley" and together with Barclays, the "Financial Advisors"), in support of their fairness opinions.

6.      The special meeting of Staples stockholders to vote on the Proposed Merger is scheduled for September 6, 2017. It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's stockholders prior to the stockholder vote, so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Regulation G, 17 C.F.R. § 244.100. Plaintiff seeks to enjoin Defendants from holding the stockholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Staples

stockholders, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant, either, because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Staples maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

11.      Plaintiff is, and at all relevant times has been, a Staples stockholder.

12.      Defendant Staples is a Delaware corporation and maintains its headquarters at 500 Staples Drive Framingham, MA 01701. Staples' common stock trades on the NYSE under the ticker symbol "SPLS".

13.     Individual Defendant Robert Sulentic is a director of Staples and is the Chairman of the Board.

14.     Individual Defendant Shira Goodman is a director of Staples and is the Chief Executive Officer of the Company.

15.     Individual Defendant Drew G. Faust is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant Curtis Feeny is, and has been at all relevant times, a director of the Company.

17.     Individual Defendant Paul-Henri Ferrand is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Deborah A. Henretta is, and has been at all relevant times, a director of the Company.

19.     Individual Defendant Kunal S. Kamlani is, and has been at all relevant times, a director of the Company.

20.     Individual Defendant John F. Lundgren is, and has been at all relevant times, a director of the Company.

21.     Individual Defendant Vijay Vishwanath is, and has been at all relevant times, a director of the Company.

22.     Individual Defendant Paul F. Walsh is, and has been at all relevant times, a director of the Company.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Staples (the "Class"). Excluded from the Class are Defendants

herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of August 1, 2017, there were approximately 656,713,321 shares of Staples common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public stockholders of Staples will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## <u>SUBSTANTIVE ALLEGATIONS</u>

## I.      **The Merger Consideration Appears Inadequate in Light of Staples' Future Outlook.**

25.      Staples, incorporated on January 23, 1986, is a provider of products and services that serve the needs of business customers and consumers. The Company offers a range of print, marketing, and technology services. The Company's segments include North American Delivery, North American Retail, and Other. The Company's North American Delivery segments, including Staples Business Advantage, staples.com, staples.ca, and quill.com, sell and deliver products and services primarily to businesses. The Company's North American Retail segment includes its retail stores in the United States and Canada. The Company operates a portfolio of retail store formats depending on various characteristics of each location. As of January 28, 2017, its North American Retail segment consisted of 1,255 stores in the United States and 304 stores in Canada. The Company has other businesses in Australia, South America, and Asia. Staples Australia serves

primarily contract and government customers in Australia and New Zealand. The Company also

has operations in China, Argentina, Taiwan, and Brazil.

26.    The Merger Consideration is inadequate given Staples' recent financial

performance and strong growth prospects.  In the year leading up to the announcement of the

Proposed Merger Staples' stock price increased over 13.5%, going from $8.07 on June 27, 2016

to $9.16 on June 27, 2017, illustrated by the chart below:



27.    Indeed, on May 16, 2017, the Company announced positive financial results for the

2017 first quarter. First quarter operating income was up 33% year-over-year, first quarter net

income from continuing operations was up 75% year-over-year, and first quarter earnings per share

were up 78% year-over-year. CEO Shira Goodman announced:

> "2017 is off to a good start and, consistent with our strategy, we
> drove solid sales growth in the midmarket and improved
> profitability in North American Retail during the first quarter. Based
> on our success growing categories beyond office supplies, we're
> intensifying our focus on several key growth categories including

> facilities supplies, breakroom supplies, furniture, technology
> solutions, and promotional products, or what we now refer to as 'Pro
> Categories'. We're pursuing this opportunity from a position of
> strength as we bring together the products, services, and expertise to
> provide a differentiated offering to business customers of all sizes."

28.     On June 22, 2017, Citi released an updated price target for Staples at an intrinsic value of $12 per share, 17% greater than the Merger Consideration. It is important to note that price targets are a predictive valuation of what a stock is worth on its own.[1] They do not account for premiums associated with a merger or takeover. A "take-out price", or the price that analysts predict in the event a merger or takeover, would include those premiums and be significantly higher.

29.     Finally, the Financial Advisors valued the company at a higher price than the Merger Consideration.  Barclays calculated an implied value per share of up to $12.40 and Morgan Stanley calculated an implied value per share of up to $12.79.

30.     In sum, the Merger Consideration appears to inadequately compensate Staples stockholders for their shares.  Given the Company's strong financial results and growth potential, it appears that $10.25 per share is not fair compensation for Staples stockholders. It is therefore imperative that the Company's stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for stockholders to properly exercise their corporate suffrage rights and make an informed decision concerning whether to vote in favor of the Proposed Merger.

## II.     The Merger Agreement's Deal Protection Provisions Deter Superior Offers.

31.     In addition to conducting an unreasonable sales process that resulted in the unfair

---

[1] See http://www.investopedia.com/terms/p/pricetarget.asp

Merger Consideration, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Staples.

32.    First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Staples stockholders. The Merger Agreement states that the Company and the Individual Defendants shall not, directly or indirectly:

> (i) solicit, initiate, knowingly facilitate or knowingly encourage (including by way of providing non-public information) any inquiries or the making of any proposal or offer that constitutes, or that would reasonably be expected to lead to, any Acquisition Proposal; (ii)  amend or grant a waiver or release, or publicly authorize or agree to enter into an amendment, waiver or release, under (A) any standstill or similar agreement with respect to any Company Common Stock (other than for Parent or its Affiliate) or (B) any applicable anti-takeover law or anti-takeover provision in the certificate of incorporation or bylaws (other than for Parent or its Affiliates), except, in each case, under the circumstances permitted under this Section 6.1(a); or (iii)  other than informing Persons of the existence of the provisions of this Section 6.1, enter into, continue or otherwise participate in any discussions or negotiations regarding, or furnish or provide access to any non-public information to any Person who has made or would reasonably be expected to make any Acquisition Proposal or otherwise for the purpose of encouraging or facilitating, any Acquisition Proposal.

33.    Additionally, the Merger Agreement grants Sycamore recurring and unlimited matching rights, which provides Sycamore with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) four business days to negotiate with Staples, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

34.    The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from

expending the time, cost, and effort of making a superior proposal while knowing that Sycamore can easily foreclose a competing bid. As a result, these provisions unreasonably favor Sycamore, to the detriment of Staples' public stockholders.

35. Lastly, the Merger Agreement provides that Staples must pay Sycamore a termination fee of $171,000,000 in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal. The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Staples stockholders with a superior offer.

36. Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

37. Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Staples' stockholders receive all material information necessary for them to cast a fully informed vote at the stockholder meeting concerning the Proposed Merger.

### III.    The Proxy Is Materially Incomplete and Misleading.

38. On August 3, 2017 Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger. The Individual Defendants were obligated to carefully review the Proxy to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information, in violation of Sections 14(a) and 20(a) of the Exchange Act, that is necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Proposed Merger.

39. First, the Proxy fails to provide material information concerning the Company's

included financial projections. Specifically, the Proxy provides projections for non-GAAP (generally accepted accounting principles) metrics, including Adjusted EBITDA and Unlevered Free Cash Flows, but fails to reconcile the non-GAAP projections to GAAP net income.

40.    When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

41.    Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with stockholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Staples has included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-

GAAP measures and disclosures.[2]

42.    In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[3] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[4] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

43.    In order to make the projections included on pages 70-72 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to GAAP net income.  Simply reconciling non-GAAP measures to EBIT is inadequate. Indeed, in the Form 8-K issued on August 7, 2017, Staples performed reconciliation of their historical Adjusted EBTIDA figures to Net (Loss) Income, as illustrated by the table below:

---

[2]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[3]    *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[4]    *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

| ($ in millions) | 52 Weeks Ended January 28, 2017 | 13 Weeks Ended April 30, 2016 | 13 Weeks Ended April 29, 2017 | 52 Weeks Ended April 29, 2017 |
|---|---|---|---|---|
| **Pro Forma Net (Loss) Income** | $    (170) | $    (38) | $    4 | $    (128) |
| Taxes | (115) | (22) | 3 | (90) |
| Interest, net | 299 | 95 | 63 | 267 |
| Amortization | 128 | 34 | 33 | 127 |
| Depreciation | 237 | 59 | 60 | 238 |

2

| ($ in millions) | 52 Weeks Ended January 28, 2017 | 13 Weeks Ended April 30, 2016 | 13 Weeks Ended April 29, 2017 | 52 Weeks Ended April 29, 2017 |
|---|---|---|---|---|
| **Pro Forma EBITDA** | 379 | 128 | 163 | 414 |
| Non-recurring items(a) | 304 | 17 | — | 287 |
| Non-cash items(b) | 133 | 47 | 10 | 96 |
| Other(c) | 5 | (1) | (3) | 3 |
| Pro Forma Cost savings initiatives(d) | 257 | 64 | 44 | 237 |
| **Pro Forma Adjusted EBITDA** | 1,078 | 255 | 214 | 1,037 |

Such reconciliations are necessary here, as well, to make the non-GAAP projections included in the Proxy not misleading.

44.    With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 8.1% to 9.8%; (ii) the inputs and assumptions underlying the calculation the terminal multiple range of EV / LTM multiples of 4.5x to 6.5x; (iii) the terminal year estimate of LTM EBITDA; and (iv) the actual terminal value calculated and utilized in the analysis.

45.    With respect to Barclay's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 8.91% to 10.21%; (ii) the inputs and

assumptions underlying the calculation the terminal multiple range of EV / LTM multiples of 4.5x to 6.5x; (iii) the terminal year estimate of LTM EBITDA; and (iv) the actual terminal value calculated and utilized in the Analysis.

46.     These key inputs are material to Staples stockholders, and their omission renders the summary of the Financial Advisors' Discounted Cash Flow Analyses on pages 64-65 of the Proxy incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions – in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id*.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices</u>. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

47.     Further, similar to the *Discounted Free Cash Flow Analysis*, the Proxy fails to disclose the inputs and assumptions underlying the following key components utilized in the *Illustrative Leveraged Buyout Analysis*: (i) the leverage multiples; (ii) the financing terms; (iii) the

exit multiple range from 4.5x to 6.5x of EV to 2021 EBITDA; and (iv) the target ranges of annualized internal rates of return of 20.0% to 25.0%. This type of valuation analysis performed by the Financial Advisors is heavily relied on by stockholders to represent a clear and accurate state of the Company's finances. Thus, in summarizing this analysis in the Proxy, the Company must be completely transparent with the information provided. The failure to include these valuable inputs renders the summary of the analysis set forth in the Proxy on page 65 materially incomplete and misleading.

48.     With respect to the Financial Advisors' *Analyst Price Targets*, the Proxy fails to disclose the individual price targets they reviewed and utilized in their analysis. The omission of these individual targets renders the corresponding summary materially misleading. Further, the Financial Advisors applied a steep discount rate to unfairly lower the already deflated values. *See supra* ¶28. Moreover, this analysis was performed only for the lower values of the price target range. A fair summary of price targets requires the disclosure of the individual targets from each equity research analyst; merely providing the range or inappropriate calculations based on a partial range is insufficient, as stockholders are unable to assess whether the banker summarized fairly, or, instead, provided only the figures that best present the price targets in light of to the Merger Consideration, i.e. as low as possible.

49.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special stockholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act, Rule 14a-9, and 17 C.F.R. § 244.100 Promulgated Thereunder)**

50.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

52.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

53.     SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement. The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading." 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure,

and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a). As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

54.    The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

55.    Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analyses performed by the Financial Advisors in support of their fairness opinions.

56.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

57.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that the Financial Advisors reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses

provided by the Financial Advisors as well as their fairness opinions and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company.

58.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review the Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Financial Advisors as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

59.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

60.    Staples is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

61.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

62.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

63.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of Staples within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Staples, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

65.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous

recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

67.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

68.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

69.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

70.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the stockholder vote on the Proposed Merger or consummating the Proposed Merger, unless

and until the Company discloses the material information discussed above which has been omitted from the Proxy;

        C.        Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

        D.        Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

        E.        Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 10, 2017

Respectfully submitted,

**MATORIN LAW OFFICE, LLC**

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**

Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com

/s/ Mitchell J. Matorin
Mitchell J. Matorin (BBO# 649304)
18 Grove Street, Suite 5
Wellesley, MA 02482
(781) 453-0100
mmatorin@matorinlaw.com

*Attorneys for Plaintiff*